UNITED STATES DISTRICT COURT                    ELECTRONIC PUBLICATION ONLY
EASTERN DISTRICT OF NEW YORK

DENNIS J. DUPREE,

                              Plaintiff,                 MEMORANDUM AND ORDER

                 - versus -                              10-CV-1894 (JG) (JO)

UHAB-STERLING STREET HOUSING
DEVELOPMENT FUND CORPORATION,
URBAN HOMESTEADING ASSISTANCE
(U-HAB), INC., UHAB HOUSING
DEVELOPMENT FUND CORPORATION,
and DEL-MAR MANAGEMENT SERVICES,
INC.,

                              Defendants.

A P P E A R A N C E S :

        JENNER & BLOCK LLP
                919 Third Avenue
                37th Floor
                New York, New York 10022
        By:     Nathaniel H. Benforado
                Susan J. Kohlmann

                        - and -

        NEW YORK LEGAL ASSISTANCE GROUP
                7 Hanover Square
                18th Floor
                New York, New York 10004
        By:     Danielle Tarantolo

                *Attorneys for Plaintiff*

        JONES DAY
                222 East 41st Street
                New York, New York 10017
        By:     Terri L. Chase
                Emilie A. Hendee

                *Attorneys for Defendants Urban
                Homesteading Assistance (U-HAB), Inc.,*

*UHAB Housing Development Fund*
*Corporation and UHAB-Sterling Street*
*Housing Development Fund Corporation*

BERG LAW, PLLC
    266 Broadway
    Suite 404
    Brooklyn, New York 11211
By:    Abraham David

    *Attorneys for Defendant Del-Mar*
    *Management Services, Inc.*

JOHN GLEESON, United States District Judge:

In this action, Plaintiff Dennis J. Dupree asserts claims for employment discrimination on the basis of race, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and for conversion. Defendants Urban Homesteading Assistance (U-HAB), Inc., UHAB Housing Development Fund Corporation, UHAB-Sterling Street Housing Development Fund Corporation (collectively, "UHAB") and Del-Mar Management Services, Inc. ("Del-Mar") have moved for summary judgment. For the reasons stated below, the motions for summary judgment are denied.

## BACKGROUND

A.    *Factual Background*[1]

    1.    *The Parties' Roles at 320 Sterling Street*

Dupree was hired as the superintendent of an apartment building located at 320 Sterling Street in Brooklyn, New York, in 2001. Pl.'s Rule 56.1 Stmt. ¶ 1, ECF No. 149. In addition to Dupree, the building's maintenance staff initially included two porters, Roger Tribble and Ronald Maxwell. UHAB Defs.' Rule 56.1 Stmt. ¶ 7, ECF No. 138. Maxwell died in 2007

---

[1]    Unless noted, the facts are not materially in dispute.

and was not replaced.  *Id.* ¶ 19.  Both Dupree (who was known at 320 Sterling Street as "Larry")
and Tribble are African-American.  *Id.* ¶ 7.

At the time Dupree was hired, the building was owned by the New York State
Department of Housing Preservation and Development ("HPD").  *Id.* ¶ 3.  In 2006, UHAB
entered into a net lease of the building from HPD.  *Id.* ¶ 4.  UHAB intended to eventually
purchase the building in order to convert it into an affordable cooperative.  *See id.*

UHAB retained Del-Mar as the property manager of the building.  *Id.* ¶ 9.  Del-
Mar was responsible for supervising the building's staff as well as ensuring that the property was
maintained and tenant complaints were addressed.  *See id.*  It had an office at the building and
one of its representatives was at the building approximately one to three times per week.  *Id.*
¶ 10.  Cassandra DelValle, an assistant property manager for Del-Mar and the daughter of a Del-
Mar owner, was the direct supervisor of the staff at 320 Sterling Street.  *Id.* ¶ 12; *see also*
DelValle Dep. 12–13, ECF. No. 150-4.  Del-Mar hired Romulo Samaniego as a Vice President in
2007 and he became DelValle's supervisor.  UHAB Defs.' Rule 56.1 Stmt. ¶¶ 11–12.  Both
Samaniego and DelValle are Hispanic.  Pl.'s Rule 56.1 Stmt. ¶ 32.

2.      *Dupree Is Told the Defendants Will Not Retain Him Because of His Race*

According to Dupree, DelValle told him in 2007 that the Defendants would not
retain him as superintendent after the building was sold to UHAB because "they are not hiring
black Americans."  Dupree Dep. 136, ECF No. 150-1.  Dupree also claims that DelValle told
him she herself had experienced racial discrimination at Del-Mar because she has dark skin.  *See*
Pl.'s Rule 56.1 Stmt. ¶ 25.  The Defendants deny that DelValle made these statements and also
deny that they engaged in any racially discriminatory employment practices.

3.      *Issues With Dupree's Job Performance*

Some tenants complained to the Defendants that Dupree was doing an inadequate job as superintendent and was failing to make requested repairs.  *See* UHAB Defs.' Rule 56.1 Stmt. ¶¶ 23–24.  They also complained that he was not doing his fair share of the work, and as a result that Tribble was over-worked.  *Id.* ¶ 22; *see also id.* ¶¶ 21, 23–24.

Dupree received written warnings from Del-Mar in March and April 2008 in connection with three incidents.  *See id.* ¶ 25; *see also* Benforado Decl., Exs. 10–12, ECF No. 150-6.  First, he had an unexcused absence one day after he was arrested on a domestic violence charge (which he claims was fabricated and later dismissed).  *See* UHAB Defs.' Rule 56.1 Stmt. ¶ 25; *see also* Pl.'s Rule 56.1 Stmt. ¶ 18.  Second, he failed to open the building's front gate for a person delivering fuel to the building.  *See* UHAB Defs.' Rule 56.1 Stmt. ¶ 25.  Third, he failed to escort a technician who came to inspect the apartments for lead.  *See id.*  In another incident, DelValle orally criticized Dupree for being away from the building on a Friday afternoon when he went to pick up his paycheck.  *See* Pl.'s Rule 56.1 Stmt. ¶ 14.

4.      *Dupree's Employment Is Terminated*

In June 2008, Dupree received a letter notifying him that his employment would be terminated after the building was sold to UHAB at the end of the month.  *See id.* ¶ 29; *see also* Benforado Decl., Ex. 14, ECF No. 150-6.  The letter invited him to reapply for a position at the building.  *See id.*  In July 2008, Del-Mar sent Dupree a similar letter notifying him that his employment would be terminated in August 2008.  Pl.'s Rule 56.1 Stmt. ¶ 29; Benforado Decl., Ex. 15, ECF No. 150-6.  This letter again told Dupree that he was invited to reapply.  *See id.*

Both Dupree and Tribble were fired from 320 Sterling Street in August 2008.  UHAB Defs.' Rule 56.1 Stmt. ¶¶ 29–30.  Both reapplied for positions but neither was rehired.

4

*See* Pl.'s Rule 56.1 Stmt. ¶ 31; Dupree Dep. 67; Samaniego Dep. 156–57, ECF No. 150-5.  They

were replaced by Hispanic employees.  Pl.'s Rule 56.1 Stmt. ¶ 33.

     5.     *Disposal of Dupree's Personal Property*

     While he was superintendent, Dupree stored tools, supplies and other personal

belongings in the building's basement.  *See id.* ¶¶ 42–44.  In August and again in October 2008,

after he was fired, the Defendants removed these belongings and put them in storage.  *See id.*

¶¶ 45–46.

     According to Dupree, no one informed him this removal would occur and when

he confronted Samaniego about it, Samaniego told him that his belongings had been auctioned

off.  *See id.* ¶ 48.  According to the Defendants, Samaniego told Dupree that his belongings were

in storage and that Del-Mar would pay for the first month of storage, after which Dupree should

retrieve them or pay for additional storage.  UHAB Defs.' Response to Pl.'s Rule 56.1 Stmt.

¶ 48, ECF No. 155.

     Eventually, the belongings were disposed of.  *See* Pl.'s Rule 56.1 Stmt. ¶ 49.  In

January 2011, Dupree's attorney sent a letter to UHAB demanding the return of his property.

UHAB Defs.' Rule 56.1 Stmt. ¶ 47.

B.     *Procedural Background*

     Dupree commenced this action *pro se* on April 26, 2010.  The original complaint

included claims against HPD and Dupree's union for unlawful discrimination on the basis of race

and age.  It also asserted a claim against the union for breaching its duty of fair representation

when it refused to initiate arbitration proceedings on his behalf.  Both HPD and the union filed

motions to dismiss in June 2010.  On August 30, 2010, I dismissed Dupree's claims against HPD

and the union as time-barred.  *See Dupree v. Local 32BJ*, No. 10-CV-1894 (JG) (JO), 2010 WL 3430530, at *3 (E.D.N.Y. Aug. 30, 2010).

However, after hearing oral argument on those motions, I decided to appoint counsel for Dupree.  On October 4, 2010, I appointed Danielle Tarantolo of Jenner & Block LLP as Dupree's counsel.[2]

On January 14, 2011, Dupree, through his new counsel, filed an amended complaint.  UHAB and Del-Mar moved to dismiss the amended complaint, arguing that Dupree's Title VII claims were time-barred and that they did not qualify as Dupree's employer for Title VII purposes.  They also argued that Dupree had not alleged a plausible conversion claim.

On April 8, 2011, I denied the motions to dismiss.  *See Dupree v. Urban Homesteading Assistance Bd. Sterling St. Hous. Dev. Fund Corp.*, No. 10-CV-1894 (JG) (JO), 2011 WL 1343163 (E.D.N.Y. Apr. 8, 2011).  I concluded that Dupree's claims against UHAB and Del-Mar were subject to equitable tolling and were therefore timely.  *See id.* at *5.  I also concluded that there were several potential grounds under which both UHAB and Del-Mar could be liable under Title VII.  *See id* at *6.  Finally, I determined that Dupree had sufficiently alleged a claim for conversion arising from the loss of his property stored in the basement at 320 Sterling Street.  *See id.* at *7.[3]

On September 28, 2011, Dupree filed a second amended complaint, which altered the configuration of Defendants and made minor changes to the factual allegations.

---

[2]        Ms. Tarantolo has since joined the New York Legal Assistance Group.  She remains counsel for Dupree along with Jenner & Block.

[3]        As noted in my April 8, 2011 memorandum and order, Dupree stipulated to the dismissal of his claims as against Samaniego and DelValle, and to the dismissal of his state and municipal discrimination claims against UHAB and Del-Mar.  *See Dupree*, 2011 WL 1343163, at *1 n.1.

After the completion of discovery, the Defendants moved for summary judgment on Dupree's Title VII and conversion claims.

DISCUSSION

A.     *Standard of Review*

"The granting of summary judgment is proper only where there is 'no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Redd v. N.Y. State Div. of Parole*, 678 F.3d 166, 173 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(a)). "A fact is 'material' for these purposes when it 'might affect the outcome of the suit under the governing law.'" *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 104 (2d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)), *cert. denied*, 132 S. Ct. 1744 (2012). A fact dispute is genuine "if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson*, 477 U.S. at 248). In making the determination as to whether summary judgment is appropriate, the evidence must be construed in the light most favorable to the nonmoving party and all reasonable inferences must be drawn in that party's favor. *Galloway v. Town of Greece*, 681 F.3d 20, 26 (2d Cir. 2012).[4]

A court must be mindful of its role in deciding whether summary judgment is appropriate. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Redd*, 678 F.3d at 173–74 (quoting *Anderson*, 477 U.S. at 249) (internal quotation

---

[4]     The Defendants challenge the sufficiency of Dupree's submissions pursuant to Local Civil Rule 56.1, which requires the parties to submit corresponding statements of the material facts as to which they contend there is no genuine issue to be tried. However, I have "broad discretion to determine whether to overlook a party's failure to comply with local court rules." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001). Even assuming some technical deficiency in Dupree's submissions, I exercise my discretion to excuse it because it is clear from Dupree's submissions and the record as a whole his positions are as to the relevant facts and how those positions are supported by the record. *See Tancredi v. Malfitano*, 567 F. Supp. 2d 506, 509 (S.D.N.Y. 2008).

marks omitted) (alteration in original).  "Credibility determinations, the weighing of the

evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of

a judge."  *Id.* at 174 (internal quotation marks and citations omitted).  "The court's role in

deciding a motion for summary judgment is to *identify* factual issues, *not to resolve them.*"  *Id.*

(internal quotation marks and citation omitted).  Thus, if the reasonable inferences that may be

drawn from the evidence could support a verdict for either side, summary judgment is

unwarranted.

B.      *Title VII Claim*

               In assessing a defendant's motion for summary judgment on a Title VII claim,

courts generally apply the burden-shifting framework first adopted by the Supreme Court in

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Lore v. City of Syracuse*, 670

F.3d 127, 169 (2d Cir. 2012); *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010).

Under that framework, the plaintiff bears the initial burden of establishing a prima facie case of

discrimination.  *See Ruiz*, 609 F.3d at 491.  This is not a heavy burden; even a *de minimis*

showing may be sufficient to establish the prima facie case.  *See Zimmermann v. Assocs. First*

*Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001).  If the plaintiff satisfies this initial burden, the

burden then shifts to the defendant to offer a legitimate nondiscriminatory reason for its action.

*Ruiz*, 609 F.3d at 492.  If the defendant provides such a reason, summary judgment will still be

denied if the plaintiff can show that the defendant's proffered reason is a pretext for

discrimination.  *See United States v. Brennan*, 650 F.3d 65, 93 (2d Cir. 2011); *Ruiz*, 609 F.3d at

492.  To show pretext, a plaintiff is not "required to prove the employer's stated justification was

asserted with intent to deceive or in bad faith"; rather, he must simply show that "discrimination

played a role in an adverse employment decision." *Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 157 (2d Cir. 2010), *cert. denied*, 131 S. Ct. 1602 (2011).

1.     *Prima Facie Case*

To establish a prima facie case of employment discrimination, "a plaintiff must show that (1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to the inference of discrimination." *Ruiz*, 609 F.3d at 491–92. Here, the Defendants do not contest that Dupree has satisfied the first three elements of his prima facie case. However, they argue that he has failed to establish that his termination occurred in circumstances giving rise to an inference of racial discrimination.

"[T]he mere fact that a plaintiff was replaced by someone outside the protected class will suffice for the required inference of discrimination at the *prima facie* stage of the Title VII analysis." *Zimmerman*, 251 F.3d at 381; *see also Finney v. Planned Parenthood of N.Y. City, Inc.*, No. 02-CV-7942 (CBM), 2003 WL 22928730, at *3 (S.D.N.Y. Dec. 10, 2003), *aff'd*, 110 F. App'x 194 (2d Cir. 2004). Here, the evidence shows that Dupree was discharged and replaced by someone outside his protected class. Though *de minimis*, this type of evidence is generally sufficient at the prima facie case stage of the *McDonnell Douglas* test. *See Zimmerman*, 251 F.3d at 381.

The Defendants do not contend otherwise, but they argue that it is insufficient in this case because they sought at one point to replace Dupree with Tribble, who, like Dupree, is African-American. In light of their desire to replace Dupree with a member of the same protected class, they argue that the fact they ultimately replaced him with someone outside that class does not give rise to an inference of discrimination.

At the first step of the *McDonnell Douglas* analysis, a plaintiff need only offer evidence from which an inference of discrimination *could* reasonably be drawn. He is not required to offer evidence compelling that inference. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 38 (2d Cir. 1994); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509–10 & n.3 (1993); *Meiri v. Dacon*, 759 F.2d 989, 996 (2d Cir. 1985). In *Meiri*, for example, the Second Circuit rejected the argument that the plaintiff had failed to establish a prima facie case because she was not replaced by someone outside her protected class; instead, her position remained open. The Second Circuit explained that this fact "may weaken, but certainly does not eliminate, the inference of discrimination." *Meiri*, 759 F.2d at 996.

Here, evidence that the Defendants sought to replace Dupree with Tribble does not preclude an inference of discrimination.[5] Although the Defendants may have initially sought to fire Dupree and promote Tribble to superintendent, it is undisputed that they fired both men and replaced them with Hispanics.

In any event, as further discussed below, Dupree's prima facie case is not premised solely on the fact that he was replaced by someone outside his protected class. Rather, he has presented additional evidence from which a jury could reasonably find that his discharge was at least partially the result of racial discrimination.

---

[5]     Even if the Defendants had replaced Dupree with Tribble, that wouldn't necessarily preclude an inference of discrimination for at least two reasons. First, in an appropriate case, a jury could find that an employer retained or hired one member of a protected class merely "as a way of concealing its prior discrimination." *Holcomb v. Iona Coll.*, 521 F.3d 130, 143 (2d Cir. 2008). Second, Title VII does not merely prohibit a categorical refusal to employ members of a protected class. *See Connecticut v. Teal*, 457 U.S. 440, 455 (1982); *Brown v. Henderson*, 257 F.3d 246, 252–53 (2d Cir. 2001). It also prohibits holding employees of one race to a more exacting standard than other employees. Thus, a reasonable jury could find for Dupree if it concluded that the Defendants fired him because he is African-American, but were willing to employ Tribble despite his race because his performance was exceptional.

2.      *The Defendants' Nondiscriminatory Reasons and Evidence of Pretext*

There is no dispute that the Defendants have proffered a legitimate nondiscriminatory reason for terminating Dupree's employment: they claim he was fired due to poor performance and unexcused absences.  Thus, to avoid summary judgment, Dupree must offer evidence from which a reasonable jury could infer that racial discrimination played a role in the Defendants' decision to terminate his employment.

There are several categories of evidence from which a reasonable jury could conclude that Dupree's discharge was motivated at least in part by racial discrimination.  Many of the underlying facts are in dispute and much of the evidence could support inferences in favor of either side.  However, viewing the evidence in the light most favorable to Dupree and drawing all reasonable inferences in his favor, as is required for purposes of this motion, a rational jury could find that this evidence establishes his claim of racial discrimination.

a.      *DelValle's Remarks About Racial Discrimination*

According to Dupree, DelValle told him that "they are not hiring black Americans."  Dupree Dep. 136.  Although the reference to "they" is ambiguous, the context of the remark would permit a rational jury to conclude that DelValle was referring to those responsible for Dupree's employment and supervision, *i.e.*, UHAB and Del-Mar.  *See Sassaman v. Gamache*, 566 F.3d 307, 313 (2d Cir. 2009) (choosing between plausible interpretations of an ambiguous statement is the jury's role).  This statement constitutes direct evidence of the Defendants' discriminatory animus.  Although DelValle denies she made this statement, *see* DelValle Dep. 145, 152, this merely creates a factual dispute to be resolved by a jury.[6]  *See*

---

[6]        The Defendants do not argue, at least for purposes of this motion, that DelValle's statement cannot be considered for the truth of the matter asserted.  Thus, I need not address whether the statement would be

*Rozenfeld v. Dep't of Design & Constr. of N.Y.*, No. 10-CV-4002 (WFK) (LB), 2012 WL 2872157, at *11 (E.D.N.Y. July 12, 2012).

Contrary to the Defendants' arguments, DelValle's statement cannot be disregarded as a "stray remark by a non-decisionmaker."  UHAB Defs.' Mem. of Law 12, ECF No. 137.  Although there is a body of case law within this Circuit addressing the insufficiency of "stray remarks," the Second Circuit has clarified that such remarks cannot be ignored:

> Where we described remarks as "stray," the purpose of doing so was to recognize that all comments pertaining to a protected class are not equally probative of discrimination and to explain in generalized terms why the evidence in the particular case was not sufficient.  We did not mean to suggest that remarks should first be categorized either as stray or not stray and then disregarded if they fall into the stray category.

*Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 115–16 (2d Cir. 2007); *see also Henry*, 616 F.3d at 149; *Sassaman*, 566 F.3d at 314; *Galimore v. City Univ. of N.Y. Bronx Cmty. Coll.*, 641 F. Supp. 2d 269, 284 (S.D.N.Y. 2009).

Instead of disregarding remarks that may be probative of discriminatory motive, a court should consider how "remote and oblique the remarks are in relation to the employer's adverse action."  *Tomassi*, 478 F.3d at 115.  "The more a remark evinces a discriminatory state of mind, and the closer the remark's relation to the allegedly discriminatory behavior, the more probative that remark will be."  *Id.*

The following factors may be relevant to this inquiry:

> (1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as

---

admissible as a statement by a party-opponent's agent or employee on a matter within the scope of the agency or employment relationship pursuant to Rule 801(d)(2)(D) of the Federal Rules of Evidence or some other provision.

discriminatory); and (4) the context in which the remark was made
(i.e., whether it was related to the decision-making process).

*Henry*, 616 F.3d at 149.  None of these, however, is dispositive.  *Id.* at 150.

Applying these factors, I conclude that DelValle's remarks are highly probative of discrimination.  First, there is at least a factual dispute as to DelValle's role in the decision to fire Dupree.  *See* DelValle Dep. 117 (testimony that DelValle was involved in discussions about whether Dupree was "good enough" to remain as superintendent); *see also Sciola v. Quattro Piu, Inc.*, 361 F. Supp. 2d 61, 69 (E.D.N.Y. 2005) (factual dispute as to supervisor's role in termination decision rendered his remarks "all the more invidious and relevant to the ultimate question of whether [the] termination was the result of deliberate discrimination").  Even if she was not involved, she was Dupree's direct supervisor as well as the daughter of a Del-Mar owner; she was not a colleague or low-level employee.  Second, her comment preceded the Defendants' decision to discharge Dupree.[7]  Third, her statement that the Defendants have a practice of not hiring black people is obviously discriminatory.  And fourth, her remarks are directly related to the claimed discriminatory motive in terminating Dupree and "could reasonably be construed . . . as explaining why that decision was taken."  *Tomassi*, 478 F.3d at 116.

Thus, the evidence that DelValle said the Defendants "are not hiring black Americans" could support an inference that Dupree's discharge was motivated by racial discrimination.[8]  *See Gomez v. N.Y. City Dep't of Educ.*, No. 06-CV-2741 (RRM) (CLP), 2009 WL 2058805, at *9 (E.D.N.Y. July 16, 2009) (statement by supervisor that plaintiff would be

---

[7]    Although the alleged remark preceded Dupree's discharge by at least six months, that does not significantly weaken its probative value.  It appears the Defendants intended for some time to terminate Dupree's employment at the same time as the transfer of ownership to UHAB.  Thus, it is plausible that they decided to fire him in 2007, but waited to do so until the transfer occurred in the Spring of 2008.

[8]    There is also evidence that DelValle had personally experienced discrimination at Del-Mar because of her dark skin.  *See* Pl.'s Rule 56.1 Stmt. ¶ 25.

denied tenure because she was Hispanic "constitutes evidence of discrimination and is not merely a 'stray' remark"); *see also Rose v. N.Y. City Bd. of Educ.*, 257 F.3d 156, 162 (2d Cir. 2001) (distinguishing "stray remarks of a colleague" from "comments made directly to [the plaintiff] on more than one occasion by her immediate supervisor, who had enormous influence in the decision-making process"); *Stafford v. N.Y. Presbyterian Hosp.*, No. 06-CV-2150 (ENV) (CLP), 2011 WL 1131104, at *9 (E.D.N.Y. Mar. 28, 2011) (supervisor's statement to plaintiff that "we don't need your kind here" at time of termination supported inference of racial discrimination); *Quinones v. Atl. Hyundai*, No. 06-CV-1626 (TLM) (ARL), 2010 WL 681671, at *2 (E.D.N.Y. Feb. 25, 2010) ("evidence of discriminatory comments made to an employee by a supervisor who had influence in the decision-making process" is probative of employer's discriminatory motive); *Rolon v. Pep Boys-Manny, Moe & Jack*, 601 F. Supp. 2d 464, 468–69 (D. Conn. 2009) (comment by supervisor, although he was not involved in the decision to terminate plaintiff, supported an inference of discrimination in light of content and timing of remarks).

　　　　b.　　*Demographics of Del-Mar's Employees*

Dupree has submitted evidence supporting an inference that Del-Mar employs mostly Hispanic employees.  Samaniego testified that the "majority" of Del-Mar's employees were Hispanic and that he could recall only two black employees working there.  Samaniego Dep. 151–52.  In addition, a list of Del-Mar employees suggests that a vast majority of them are Hispanic.  *See* Benforado Decl., Ex. 16, ECF No. 150-6.[9]  According to Dupree, 24 out of 27 of Del-Mar's former and current employees are of "Hispanic or Latino descent."  Pl.'s Mem. of

---

[9]　　　　The list does not indicate race, but it does list both country of birth and of ancestry.  *See* Benforado Decl., Ex. 16.  Because "[r]ace . . . may sometimes be correlated with national origin," *Dennis v. Pan Am. World Airways, Inc.*, 746 F. Supp. 288, 291 (E.D.N.Y. 1990), the list is at least somewhat probative of the racial makeup of Del-Mar's employees.

Law 14–15, ECF No. 153.  The same is true for 13 out of 14 of those employed by Del-Mar as of August 25, 2011.  *See id.*  Del-Mar does not dispute these numbers.[10]  This evidence that Del-Mar employs Hispanics almost exclusively supports an inference that Dupree was fired and replaced with a Hispanic person for racially discriminatory reasons.

The Defendants argue that the list of employees shows that Del-Mar employed the "descendants of 10 different countries – an extremely culturally diverse group of employees that would hardly be indicative of race discrimination."  UHAB Defs.' Reply Mem. of Law 8, ECF No. 154.  While Del-Mar's employees may have been diverse in some respects, that does not preclude a finding that it engaged in racially discriminatory practices.

### c.    *The Termination of Tribble*

The Defendants' treatment of Tribble is also probative of discrimination.  They simultaneously fired the building's two African-American employees – Tribble and Dupree – and replaced them with Hispanics.  This supports an inference that Dupree's termination was motivated by racial discrimination.

The Defendants repeatedly argue that their treatment of Tribble weighs against an inference of discrimination.  They argue that while they wanted to fire Dupree for poor performance, they wanted to retain Tribble due to his excellent work and popularity with tenants.

This argument would have greater force if the Defendants had actually retained Tribble.  But the undisputed fact is that they fired him at the same time and in the same manner

---

[10]    Del-Mar argues that the document from which Dupree draws these numbers should be disregarded because it has not properly been authenticated.  But the document was produced by the Defendants in response to a discovery request for documents identifying their employees.  Under these circumstances, the very act of producing the document is sufficient to authenticate it.  *See, e.g.*, *U.S. Info. Sys., Inc. v. Int'l Broth. of Elec. Workers Local Union No. 3*, No. 00-CV-4763 (RMB) (JCF), 2006 WL 2136249, at *6 (S.D.N.Y. Aug. 1, 2006); *Wechsler v. Hunt Health Sys., Ltd.*, No. 94-CV-8294 (PKL), 2003 WL 21998985, at *2 n.4 (S.D.N.Y. Aug. 22, 2003); *John Paul Mitchell Sys. v. Quality King Distribs., Inc.*, 106 F. Supp. 2d 462, 472 (S.D.N.Y. 2000).

as they fired Dupree.  They then replaced both Tribble and Dupree with Hispanic employees.[11]

There may be, as the Defendants suggest, a benign explanation for the treatment of Tribble, and

they may persuade a jury to credit that explanation.  However, for purposes of this motion, I

must view the evidence in the light most favorable to Dupree.  Viewed in that light, Tribble's

discharge supports an inference that the Defendants' discharge of Dupree was discriminatory.

        d.     *Efforts To Create a Paper Trail*

        A reasonable jury could find that the Defendants sought to manufacture a paper

trail to justify their decision to fire Dupree.  This would support an inference that the Defendants

decided to terminate Dupree's employment due to his race, and then sought to document

purported performance problems to create an after-the-fact justification for their decision.  *See,*

*e.g.*, *Krieger v. Gold Bond Bldg. Prods.*, 863 F.2d 1091, 1098–99 (2d Cir. 1988) (evidence that

the defendants "had carefully crafted a 'paper trail' to justify [the plaintiff's] eventual firing"

supported an inference of discrimination (other internal quotation marks omitted)); *Heinemann v.*

*Howe & Rusling*, 529 F. Supp. 2d 396, 413 (W.D.N.Y. 2008) ("evidence that defendants . . .

began laying down a paper trail . . . leading up to plaintiff's termination" was "at least consistent

with an inference that defendants . . . decided to build a case against her to justify her

termination"); *Taylor v. Polygram Records*, No. 94-CV-7689 (CSH), 1999 WL 124456, at *23

(S.D.N.Y. Mar. 8, 1999) ("One could plausibly conclude that the memos [documenting the

plaintiff's performance] demonstrated an effort to proliferate complaints as part of a

manufactured paper trail to justify [her] discharge."); *Evans v. Connecticut*, 935 F. Supp. 145,

160 (D. Conn. 1996) (evidence that the defendants' proffered reasons "were the product of a

---

[11]     Tribble apparently reapplied for his old job but was not rehired for reasons that are unclear, although he may have been unwilling to return unless Dupree was also rehired.  *See* Dupree Dep. 67; Samaniego Dep. 156–57.

search for reasons to justify the adverse employment decision"), *amended*, 967 F. Supp. 673 (D. Conn. 1997), *aff'd*, 24 F. App'x 35 (2d Cir. 2001); *Khabo v. Linnon*, No. 89-CV-275 (KC), 1991 WL 95419, at *8 (S.D.N.Y. May 28, 1991) (evidence that employer "was creating a 'false paper trail' to make its decision to terminate [the plaintiff] seem legitimate").

   There is evidence from which a jury could find that Dupree performed his job well.  See Pl.'s Rule 56.1 Stmt. ¶¶ 4–5.  HPD was satisfied with Dupree's performance during the period it was responsible for the building.  *See id.*  Even after UHAB and Del-Mar took over, DelValle's weekly reports from December 2007 to February 2008 regularly document Dupree's performance of his duties and do not identify any significant problems with his work.  *See id.* ¶ 10; *see also* Benforado Decl., Ex. 7, ECF No. 150-6.

   A jury could reasonably conclude that it was only when the Defendants set out to justify their decision to terminate Dupree that they began to document problems with his performance.  The agenda for a March 5, 2008 meeting reflects HPD's view that "Del Mar Management did not provide clear proof of super[']s actions, lack of work ability or anything that states the super[] is not completing his job."  Benforado Decl., Ex. 8, at 1, ECF No. 150-6. Several weeks later, Marina Metalios of UHAB wrote to Samaniego that "Del-Mar was working up some reports (??) on [Dupree] to establish ground to fire him and I want to make sure that data is being gathered."  Benforado Decl., Ex. 13, at 1, ECF No. 150-6.  Thus, Dupree can reasonably contend that the Defendants consciously set out to document performance issues, perhaps in response to HPD's skepticism.

   Despite the efforts to "work[] up some reports," there is evidence that the Defendants failed to come up with enough problems to justify firing Dupree.  The minutes of a May 27, 2008 meeting attended by Metalios, Samaniego and others show concern as to whether

there was "adequate documentation" to terminate Dupree's employment "for cause."  Hendee

Decl., Ex. G, at 6, ECF No. 139-7.  The minutes further show that a decision was made that

Dupree would *not* be terminated for cause.  *See id.*; *see also* Metalios Dep. 145, ECF No. 150-3.

There is also evidence that, in at least some instances, the Defendants arbitrarily

documented ordinary events as purported performance lapses.  For example, Del-Mar issued a

written warning to Dupree after he supposedly failed to open the building's front gate for the

delivery of fuel.  *See* Benforado Decl., Ex. 11.  However, according to Dupree, he had never had

to be present at the gate for fuel deliveries during the many years he worked at the building and

was not even informed in advance when fuel deliveries would occur.  Dupree Dep. 97.  In

another incident, DelValle criticized Dupree for being absent from the building one Friday

afternoon even though she knew that Dupree regularly went to pick up his paycheck at that time.

Pl.'s Rule 56.1 Stmt. ¶ 14.

A jury could reasonably find that these performance issues were not the real

reason for firing Dupree, but discrimination was.  *See Reeves v. Sanderson Plumbing Prods.,

Inc.*, 530 U.S. 133, 147 (2000) ("Proof that the defendant's explanation is unworthy of credence

is simply one form of circumstantial evidence that is probative of intentional discrimination, and

it may be quite persuasive.").  The inference of pretext is further supported by evidence that, in

their own view, the Defendants' efforts to document grounds for a for-cause termination failed.

As the Defendants argue, there may be reasons for the creation of a paper trail that

had nothing to do with discrimination.  They may have genuinely believed that Dupree was not

performing his job adequately for some time, but only began documenting problems when they

had reached the decision to fire him in order to, for example, satisfy the union.  But a jury, not a

judge, should decide whether that was the motive leading to the creation of a paper trail, or

whether that paper trail was intended to establish a pretext for discrimination.

      3.     *Whether Del-Mar Can Be Liable Under Title VII*

      Del-Mar argues that summary judgment is appropriate because there is no

evidence from which a reasonable jury could find that it was Dupree's employer for Title VII

purposes.  It argues that UHAB alone was responsible for the decision to terminate Dupree's

employment.  Dupree responds that there are triable issues of fact as to whether Del-Mar is liable

under Title VII under either a "joint employer" theory or an agency theory.

      In a previous opinion denying the Defendants' motions to dismiss, I set out the

standards for Title VII liability under a joint employer theory:

> Under this doctrine, an employee who is formally employed by
> one entity but has been assigned to work in circumstances
> justifying the conclusion that he is at the same time constructively
> employed by a second entity may sue the latter entity for violations
> of Title VII.  A joint employer relationship may be found where
> there is sufficient evidence that the defendant had immediate
> control over the formal employer's employees.  In making the
> essentially factual determination as to whether two entities are
> joint employers, courts consider such factors as commonality of
> hiring, firing, discipline, pay, insurance, records, and supervision.

*Dupree v. Urban Homesteading Assistance Bd. Sterling St. Hous. Dev. Fund Corp.*, No. 10-CV-

1894 (JG) (JO), 2011 WL 1343163, at *6 (E.D.N.Y. Apr. 8, 2011) (internal quotation marks and

citations omitted).

      Applying these standards to the record evidence, I conclude there is a genuine fact

issue as to whether Del-Mar was a joint employer of Dupree.  There is ample evidence in the

record that Del-Mar was responsible for paying, supervising, disciplining, hiring and firing the

employees at 320 Sterling Street.  Del-Mar was responsible for making sure the building staff

was paid.  *See* Metalios Dep. 63; Benforado Decl., Ex. 20, ECF No. 150-6.  Dupree's immediate

19

supervisor was DelValle, who worked for Del-Mar.  She told him the tasks he needed to

complete and monitored his performance.  *See* DelValle Dep. 28–32.  When Dupree received

written warnings about his job performance, they came from Del-Mar.  *See* Benforado Decl.,

Exs. 10–12.  Del-Mar was heavily involved in the discussions about terminating Dupree's

employment.  *See, e.g.*, Metalios Dep. 101, 174.  One of the two letters Dupree received

notifying him that he had been fired came from Del-Mar.  *See* Benforado Decl., Ex. 15.  And

Del-Mar was involved in hiring Dupree's replacement.  *See, e.g.*, Metalios Dep. 200.  From this,

a reasonable jury could find that Del-Mar was a joint employer of Dupree, even if the ultimate

decision to fire him was UHAB's.

This evidence could also support a finding that Del-Mar is liable as an agent of

UHAB.  *See Dupree*, 2011 WL 1343163, at *6; *see also* 42 U.S.C. § 2000e(b) ("any agent" of an

employer can be held liable under Title VII); *Gulino v. N.Y. State Educ. Dep't*, 460 F.3d 361,

378 (2d Cir. 2006) ("Title VII itself explicitly recognizes that 'any agent' of an employer will be

liable for discriminatory behavior.").  Since much of the responsibility over the employees at 320

Sterling Street was delegated by UHAB to Del-Mar, there are triable issues of fact as to whether

Del-Mar is liable as the employer's agent.  *See, e.g.*, *Zhao v. State Univ. of N.Y.*, 472 F. Supp. 2d

289, 315 (E.D.N.Y. 2007).

C.    *Conversion Claim*

The Defendants seek summary judgment on Dupree's conversion claim because

they argue he did not demand the return of his property for more than two years.  Although an

unreasonable delay in demanding the return of lawfully possessed property will bar a conversion

claim, *see DeWeerth v. Baldinger*, 836 F.2d 103, 106–08 (2d Cir. 1987), there is a genuine issue

of fact as to when Dupree first demanded the return of his property.[12]   According to Dupree, he was never warned in advance that his property would be removed.  *See* Dupree Dep. 249.  When he discovered the removal, he confronted Samaniego, who told him the property had been auctioned off.  *See id.*  Since there is evidence that Del-Mar was UHAB's agent, a jury could find that Dupree's discussion with Samaniego satisfied the demand requirement in a reasonably timely manner.  *See Bos. Concessions Grp., Inc. v. Criterion Ctr. Corp.*, 673 N.Y.S.2d 111, 112 (App. Div. 1st Dep't 1998) (viable conversion claim where "plaintiff did demand the return of these items and . . . defendant *or its agent* refused to do so" (emphasis added)).

The Defendants also rely on *Priester v. R.F.H. Realty Corp.*, 180 N.Y.S.2d 617 (App. Div. 2d Dep't 1958), for the proposition that the removal and storage of the belongings of a former superintendent who has been evicted and had his employment terminated does not constitute conversion.  I do not believe that *Priester* categorically bars the claim Dupree asserts here.  *See, e.g.*, *Wilson v. CRL Mgmt., Inc.*, 829 N.Y.S.2d 424, 425–26 (City Ct. Rochester 2006).  In particular, Dupree challenges not just the removal and storage of his property, but the subsequent loss of the property at auction without having been afforded the opportunity to recover it.

---

[12]   Because I conclude the conversion claim must be tried, I need not address Dupree's argument that his property was taken unlawfully and thus no demand was required.

CONCLUSION

For the reasons stated above, the Defendants' motions for summary judgment are denied.

So ordered.


John Gleeson, U.S.D.J.

Dated:  August 10, 2012
        Brooklyn, New York